Good morning, your honors. My name is Richard Kelner. I'm here on behalf of Vaccine Center. I'd like to reserve five minutes for rebuttal. Robertson-Kaplan case, I haven't seen one of those in years. Maybe decades. I don't think... Robertson-Kaplan was still around. Still around and well. And actually that's probably why this is an important case for your honor to consider. I think the fundamental problem with the defendant's arguments is that what they do is they conflate the concept of intended institutional operations within the context of own use exemption with the mission statement or goals of a Nevada agency. Are we really worried about what the specific legal standard or authority is? What are we talking about? I think this is more of an application. You talked about their goals. It doesn't seem to me that you're even disputing that the defendant qualifies under the first test, nonprofit, eligible institution. All we're talking about is the purchases in question for their own use. Right. And when we're talking about their own use, we're trying to determine what own use means, right? That's correct, your honor. And there is no specific legal standard or authority for determining the scope of that function, is there? Well, I think that when you're dealing with Abbott Laboratories, it just accounts that they do give the parameters, and the parameters... D. Modena. D. Modena, sorry. I'm from Idaho. I get these wrong every time. I'm originally from New York and I have the same problem. I mean, in D. Modena, we had an HMO in Abbott. We had a hospital, and they differentiated even between the HMO and the hospital. Right, but what I think this distinction is important is they're talking about institutional operation, and that's a lot different. And they both are applying the standard from Abbott Laboratories in Jefferson County of what is the institutional operation. And let me give an example why that is so significant here, because what you have here is an expanded attempt to get own use immunity because of a mission statement that says promotes the health and well-being of Nevada citizens. That's as broad as you can get. And when we're talking about exemptions... It's the cause of deaths, but that is their duty. Well, let me... Do we look at what health districts generally do, or do we look at this particular Nevada statute and its authorization for this agency? Well, I think that you have to look at the operation, and I think that's the difference that I think is important here. It's not the mission statement. It's the operation. So, for instance, when you're talking about Abbott Laboratories, you're talking about the operation of a hospital, the pharmacy in a hospital. I think your honor is correct that we have to look at the inception of the operation. What's the operation of a health district? And how does one go about determining that when every state that has health districts seems to approach it quite differently? Well, I think you have to look at what they're actually running here, because here's the difference. I think that when you look at how exemptions are supposed to be narrowly construed, on the flip side, now you're looking at a mission statement, which is as broad as possible. Let me give you an example of what would fit in here. What would fit in here is if the government decided that they want to have their own grocery stores, because they believe that it's important to have good food, and they get the food at a cheaper price. They could wipe out all the supermarkets in the state. I understand your point, and you addressed that in your briefing as well, and I see how Abbott looked at what's the basic institutional function of a hospital, and the Kaiser case looked at HMO, so how does a court go about looking at what is the basic institutional function of a health district? I think you have to look at it factually, and here the most you can say is that they had a clinic that they would set up. So you have to look factually at it and apply it. But you don't look at the mission. The mission is something that's totally different. So, for instance, in this situation, when you have the health district actually sending out solicitation letters, commercial solicitation letters, to casinos, to businesses, that takes it far beyond, and I think that what's important is there's a lot of confluence here as well. If I look at the Nevada Revised Statute 439-3502, it says that the SNHD is authorized to regulate as necessary for the prevention, suppression, and control of any contagious or infectious disease dangerous to the public health. That seems a pretty logical way to draw, if you will, a function. If we were to do that, and then if you go to Clark County, it says, and I read from Clark County Code, the SNHD shall establish and conduct a comprehensive program of health which shall include the control of communicable diseases, providing the SNZ with the power to take whatever action that is necessary to control the diseases. So it's another part of the institutional function. And if that is, again, I think we're getting to mission and goals, but even if we use. But this is not a goal. This is a legal authority, and if you will, the SNHD has to establish and conduct it by law. Okay, so. This is not just a big goal out here. This is the state of Nevada and the county of Clark saying, this is what you've got to do. Okay, so I'll give you two responses to that, Geronimo. First of all, I think City of Lafayette deals with one aspect of that, which is, I'll quote it very quickly because what it says essentially is that we're not going to necessarily say that a government agency is the only one capable of accomplishing goals. They say, but the economic choices made by public corporations and the conduct of their business affairs, designed as they are to ensure maximum benefits for the community and constituency, are not inherently more likely to comport with the broader interest of national economic well-being than those of private corporations acting in furtherance of the interests of organizations and the shareholders. So what I think that we have to look at here is, number one, if we go precisely to your argument about commutable diseases. No, this isn't an argument. Well, it's a question. All right. With Nevada law and Clark County law attached to the question. And what I'm saying is that if you look at, first of all, the question, again, that you're going to have to ask is, is this necessary for the control of commutable diseases? I looked at what you specifically argue. You say they charge a fee to administer the vaccines. That's a big problem for you. Well, it's a cost plus, yes. Okay. But the whole process is on a non-profit basis. They can only spend these resources for public health purposes. So I don't know why the fee is relevant at all. Well, I think that the fee is relevant for the following reason. If the purpose is to maximize the opportunity for people to have vaccines, then there should be a non-cost benefit. There is a non-cost. Oh, yes. All they do is charge exactly what they have to pay and get it done. And if they make anything, it goes back into doing the same thing. But I think the concept that's important here is that they don't, for instance, give the vaccines out to the poor, which would be their charge. They don't do that. They make this a commercial enterprise that's based upon a person's ability to pay. There is no evidence in this record that anybody can get a vaccine if they don't have the money to pay for it. But the other part that's important is that… Pays for them. The individual. Well, the poor can pay. They can pay. Oh, that's precisely my point. If this was supposed to be consistent with what your honor is saying about controlling diseases, then they would have been offering these vaccines. Does the government agree to pay? Does the state of Nevada agree to pay? Did the Clark County agree to pay? Because the state of Nevada, Clark County, sets up this organization, gives it a job to do, and says do it as little as possible. Don't make any profit, and make it happen. And all you're saying is because they don't give it to the poor it doesn't work. Well, who would pay? They have no resources to pay. They're giving it out at as little cost as possible. Well, actually, there's no proof of that. Well, I understand, but you say they charge the fee. I say to myself, so what? Even if they make any money, it just goes back into reducing the next or the other programs they do. But I think the problem is that what they're doing is they're getting rid of all the doctors in Nevada who give vaccines because they're undercutting all the business. They're going directly to casinos and to the other businesses to get that business from my clients. But the other part I think that's important for what your honor was talking about before is something that's in the GSK brief on page 23 to 24. Because what they say with respect to vaccines that we're talking about here, which is Hep A and Hep B, that the CDC recommends adults who are not vaccinated as children for Hep A and Hep B whose health, job, or lifestyle might put them at greater risk for serious disease. There's no screening for that. What is done here, and I think to squeeze this, look at the facts here. What they're doing is they're operating a business. They're not trying to basically solve immunization. There's no fact here that shows that this is set up for the purpose of reducing diseases. This is purely a business enterprise as it is spelled out here, which goes soliciting directly to employers. And I think the problem here, again, is that we're soliciting new customers. I realize you made that argument, but I guess if I read the Nevada law and I read what Clark County has suggested they do, I don't know why they wouldn't have the idea that they're supposed to vaccinate as many people as they can. Well, if they're supposed to vaccinate as many people as they can, driving out doctors to give out vaccines is not exactly advancing that goal. And I think that the problem here is- Well, driving out doctors to give out the vaccines is definitely something you can talk about on Robertson-Papman, but you've got to say they violated it in order to make that argument. Don't go to the end result. Let's talk about the argument. And what I have to look at to decide if they really are doing it, and what I have here, which is what I've tried to put to you, is I have to look at what is, in fact, their, I don't want to call it mission, but their institutional function. And then after finding the function, then I have to say, does this meet the function or not? Whether it drives out the doctors or not, that's an end result, and that has not one thing to do with it. What I'm trying to figure out is, do they meet the function? Because I'd be the first one to say we ought to have competition, but I have to now put this law into effect. And what I'm suggesting, Your Honor, is because all these exemptions have to be narrowly construed, you can't have broad mission statements dictate what the institutional operation is, because then it would be a mission statement, I'd agree, but it isn't. It's Nevada law, not only saying what they do, but directing them to do it. That's different than a broad goal. But the law does not direct them to enter into a commercial enterprise and solicit the casinos that does not have the aspect of essentially not directing this to, as the statute talks about, for the poor and the people who don't have very afforded. You have about a minute and a half left. You don't receive five minutes. Okay, thank you, Your Honor. Okay, we'll hear from both sides. That's fine, go ahead. Good morning, may it please the Court. My name is Stephen Kastenberg, and I am arguing on behalf of the Technical Access with Kline. And as Mr. Koffing said, I will take up to ten minutes and reserve the rest for Mr. Koffing. The Vaccine Center's complaint, as you know, is that the Southern Nevada Health District, a public health organization created by Nevada statute and Clark County statute, is able to provide vaccines at lower cost because it purchased vaccines from Access with Kline through a federal program called the Prime Vendor Program that provides discounts on drugs and other pharmaceutical products to statutorily identified categories of charitable institutions. So can I ask how do you see if one determines the basic institutional function of this health district?  But as Judge Smith found, what I was going to say here is you have the easiest job in the world because there are statutes and code ordinances that define specifically. And yes, I'm glad that my brother raised the issue of Southern Nevada going off and opening a grocery store or a health food store because ostensibly there could be activities conducted by Southern Nevada that would scratch the outer bounds of the NPIA in its institutional function. And then you would have a hard question before you, but you don't have that question before you. And you have a very specific code, as quoted by Judge Smith, that focuses on preventing communicable diseases and taking what action is necessary to do that. And you have, clear from the affidavit of Southern Nevada and from its ordinary course business website, identifying that one of the main ways that it does that is it engages in preventative vaccines. And there's been no dispute about the importance of vaccination preventing these very serious communicable diseases. There are only four vaccines that are at issue in this case, and they treat hepatitis A and B, or they prevent hepatitis A and B, diphtheria, pertussis, and tetanus, all very significant diseases, two of which, hepatitis A and B, are still very substantial health problems in this country. The others, less so because of the vaccinations. And with vaccines, vaccines is a unique product. It is not like a prescription drug. First of all, in Nevada, you don't need a prescription to get a vaccine. That's why when people go get, for example, their flu vaccine, they go to the Rite Aid or some other pharmacy where they get it elsewhere, and they don't necessarily get it from a physician. And it's a one-time event. It is not like in a hospital or a healthcare system where you have ongoing treatment. To fulfill the basic institutional mission of preventing these diseases, Southern Nevada wants to maximize the vaccination rates. And that, in fact, to have effective healthcare is what you have to do. As from the various documents that we cite, there is something called herd immunity with vaccines. And in essence, to be effective, you have to have high vaccination rates. It's a much more effective public health option once you achieve that. So, of course, it goes to the core of Southern Nevada's basic institutional function to vaccinate, to prevent these communicable diseases, and to do so by reaching the maximum number of people, not just the poorest in our society. Under DiMatteo, it was very clear that healthcare itself is a charitable function. You would say they underpriced the private sector. I don't think they're trying to underpriced or overpriced. They are charging. I thought I was stating a fact. That's not a fact. They charge less. They charge more than doctors? Well, all we know is what the vaccine center asserts that it charges, and they assert that they pay more for and charge more for these particular vaccines than Southern Nevada, yes. But as Judge Smith pointed out, and that is one of the. I didn't understand your question. Did you understand my question? I didn't understand your answer. Did you understand my question? You were asking whether Southern Nevada charges less than physicians do for these vaccines. That's what I was asking, which is capable of a yes or no answer. We don't have something. Sorry. I'm sorry, Your Honor. What I say is the only thing in the record is what the vaccine centers. Well, what did you say, yes or no? The answer is yes. Yes as to the vaccine center, Your Honor. Okay. So what I asserted at the beginning was this is private. So the way they're trying to promote herd immunity is by selling the market and undercutting, underselling private vendors. That's how they're doing it. The entire. It's a fact. One way or the other, it's true or not. Well, to the extent you're ascribing an intent to their pricing, I can't address that, and that's not in the record. I was trying to say my intent. Well, you said they're trying to undercut the market, and that's what I'm not sure they are. They're undercutting the market. They're selling less. They're engaging in the same business as the private enterprise. They're selling it for less. The entire purpose of the Nonprofit Institution Act, Your Honor, is to allow charitable institutions to stretch their dollars to buy at a lower cost than for-profit institutions and to fulfill their basic institutional function. Well, they can fulfill it in various ways, and one way they can do it is by giving it away to people who can't afford it. I mean, that's one way of fulfilling their function. In this case, they happen to fulfill it by simply selling it to everybody for less than the private sector can sell it. And they can do that because they get a special deal that the private sector doesn't get. That is what the Nonprofit Institution Act allows them to do, Your Honor. Yes. But only as far as it's within their basic institutional function. But only as far as it's within their basic institutional function, just like presumably the discounted pricing to Kaiser Healthcare, one of the largest businesses in this country, which is a nonprofit, also benefited from its purchases under the Nonprofit Institution Act. And presumably they competed with for-profit institutions, just like the hospital in Abbott was a nonprofit hospital and presumably competed with for-profit hospitals in the region. Competition is not the issue. Charging fees is not the issue. Presumably the hospital... It's a fantastic case to say that competition is not the issue. I mean, isn't that the whole point of the Ombuds Department, that they have to protect competition? We are there to apply the statute, Your Honor. If you say, if your argument is competition doesn't matter, it sounds a little odd to this case, doesn't it? Well, Congress is the one that made that determination, Your Honor, by passing the Nonprofit Institution Act, which is a specific exemption from the Robinson Act. Well, they made that. I'm sorry, it says that? It says it's a specific exemption? Well, Abbott certainly says that, Your Honor. It is a congressional statute. No, what Abbott held is that the way Abbott operated its enterprise, it didn't violate the Ombuds Department, right? It does not state that any charitable, any nonprofit is exempt from the Ombuds Department Act. It certainly does not say that, in fact. It doesn't say that any nonprofit? Yes, you're correct, Your Honor. So you overstated it when you said it did. I didn't mean to, Your Honor. The statute refers to charitable institutions. That is not the challenge here, Your Honor. In fact, the only way you get the exemption is for your own use, right? That is correct, Your Honor. Otherwise, you would be in violation, correct? That is correct, Your Honor. Even though nonprofit, even though meeting standard of nonprofit and an eligible institution, if it isn't for your own use, you'd be violating the act. That is correct. So we're focusing on own use. Yes, Your Honor. Tell me how it's your own use when you vaccinate foreign travelers. Isn't it a legal requirement to vaccinate foreign travelers? Why is it in your function to do that? There is no evidence in the record that there's a legal requirement to vaccinate foreign travelers, Your Honor. That is a unsupported statement in the reply brief of the vaccine center. In fact, it is incorrect. And if Your Honors want to take public notice of that, they can go to the State Department's website, which identifies that there are certain countries for which there are legal requirements and many for which there are not. For example, you could travel to China, you could travel to Mexico, you can travel to other countries like all of Western Europe, and there are no legal requirements. There are none cited by the vaccine center, and there's none in the record that is simply an unsubstantiated and incorrect statement by the vaccine center. What about soliciting new customers? What is that? I mean, that, if we're looking at Abbott, seems to me that would go, Abbott would tell us soliciting new customers is not within your function. I don't believe there's anything, Your Honor, within Abbott or within Dena that said that Kaiser or that hospital could not advertise. In fact, in order to achieve preventing communicable diseases, Your Honor, the Southern Nevada Health District wants to have the highest vaccination rate that it can. Clark County happens to have a historically relative low vaccination rate compared to other parts of the country. In order to achieve herd mentality and to achieve its basic institutional function, it needs to maximize that. With her muted, do you not have mentality? With those things. It's for people who go to the casinos. That may be, Your Honor. You're down to five minutes. I'm down to five minutes. I'm going to pass my time to Mr. Coffey. All I would say for one second on the immunity issue is that, Your Honors, the immunity issue also provides an alternative basis for affirming. I know the district court said that there was a requirement of a contract, but I don't believe that there is. There was, in fact, in any of any contracts. I'm not going to give you some time. You should be able to take it out. That provides an alternative basis, Your Honor. Thank you. Jerry Coffey on behalf of the Southern Nevada Health District. I'm asking the court today to affirm the ruling below by Judge May and grant a summary judgment to the health district based upon the own-use exemption that you've been discussing. I can think of no greater or more clear example of own-use than the administration of vaccines to the public, and that is a core function of the health district amongst the myriad. Exemption talks about its own use. Correct. That's a test. The own-use, Your Honor, is we're obtaining these vaccines. What would be not the own-use? Give me an example of something where they wouldn't, under your definition, they wouldn't be the own-use. In the relation to vaccines, Your Honor, I can't think of one. In fact, that's a question I'd posit to my colleague across the aisle that under their definitions there would be no set of circumstances in which the health district So your view is that that is not a restriction at all, that for the own-use is not a restriction at all? In the facts before this court, that is not, Your Honor, because What about if all the gamblers were offered free vaccines? Well, we don't offer The reduced rate, would that fall within the own-use? When you say all the gamblers, are you talking about I'm talking about the ones in Las Vegas. Okay. Then it is the goal of the health district is to immunize as many people as possible, not only for the protection of our own citizens. Someone receiving a vaccine will be that much less likely to transmit disease to a resident of the state. And that goes to your question, Your Honor, is that what about travelers? Well, those travelers are going to jurisdictions or other areas in which it's more likely that they'll be infected by a communicable disease and then bring it back to Southern Nevada. And that is why there is no distinction, as Judge Mahan pointed out, that there is no distinction between the who we inoculate or their economic basis or economic means. That's not a task for own-use that my colleague, again, wants to set up. So it's a core function that is, in this case, unlike Abbott and Demodena, that is defined by statute. And we don't need to go into an intensive fact analysis based upon the clear statutes. And I would add to that NRS 41A or, I'm sorry, 441A160, which provides additional statutory authority that requires the district to abate and do what they can to prevent. It's important to note that, unlike Kaiser and Modena, we are a health district. We are not a medical facility. As I told my colleagues, if you show up with a broken arm, you're going to be turned away. We'll call an ambulance for you. But we don't treat people like a hospital facility does. We establish clinics in which people may come in and receive the vaccinations, and we provide other clinical services on the basis of other communicable diseases. But we do not have an x-ray machine. How is that for your own use? How is the treatment of it? If you establish these clinics, why is that for its own use? That is our very function, to provide the services to the residents of Clark County, which encompasses all of southern Nevada, pursuant to the statute that is our use. Do you fund the clinics? The clinics are funded by property taxes. We have a set mill rate within another part of the statute. And then we're also funded by grants and the fees that we charge. Who operates the clinics? The clinic is operated by a chief in Board of Health, using employees of the health district, and they're governed by a board encompassing all the jurisdictions within southern Nevada. So we're governed by a board of health who operates and a chief health officer who administers all these functions. So in response to where I think it's important that we look in Abbott, in which in Abbott the court said clearly that the door sill of the facility is not going to be a defining barrier to what constitutes own use, and much has been made about a prior practice of going out into various businesses and providing vaccines. Again, I'd say that that is simply a more effective way to vaccinate as many people as possible, the people on the front lines, who are more likely than not going to be exposed to a communicable disease by virtue of the interaction with the public. So while it's not a current practice, it is something that was done in the past. Thank you. I will be very brief, to be honest. First of all, the question was about the pricing. We showed proof of the pricing, is that the price at which my client gets the vaccine is substantially higher than the price that it's sold by the health district. I think also, with respect to just previous questions, I think it's important to realize we're talking here about an exemption that has to be narrowly construed, and that's where I think we have to look at the operations and look at it in that prism. And because of that, when you're talking about things such as soliciting casinos, we have to look at the world of vaccines, the group of people who are getting vaccines from doctors, this group of people who are not getting it from doctors. I don't believe that you can expand the whole concept of this exemption to wipe out one side. The price that the doctors are charging is not in the record, is it? The only thing that's in the record is what you have to pay, and therefore you have to charge, vis-a-vis what the public health district does. No, we have the price that the health district is charging. The price that the health district is charging is below. But there's something in there about doctors. Oh, no, my client at the vaccine center are doctors, and they're getting the vaccines at a price that's higher. I understand that argument because you're talking about doctors in general, and the doctors at the vaccine center is what you're talking about. Correct, and that's really what this antitrust argument is about, is that they're wiping out doctors, and you can't just say there's one part of the doctors who provide the service, and the health district wants to wipe it all out. And they want to wipe it all out because they are choosing this grand, large mission, and that just can't be consonant with the narrowly construed exemptions, and especially when you have the affirmative act, which can't be within the operation that was described of soliciting of the contracts that were sent out to casinos. And we're not talking about people who can't afford it. As a matter of fact, that's the most glaring thing here, is that if somebody can't afford the vaccine, they don't get it, because there's no proof here. The proof here is they have to pay, and that makes it a commercial enterprise. Thank you.
judges: Kozinski, N.R. Smith, Gleason